## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| RUSBEL RAMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19 C 1522 |
| v. | ) | |
| | ) | Judge John Z. Lee |
| ILLINOIS GASTROENTEROLOGY | ) | |
| GROUP, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Rusbel Ramon was terminated from his position as a histology technician by Illinois Gastroenterology Group, LLC ("IGG") in April 2018. Ramon asserts that he was terminated unlawfully due to his age, in violation of the Age Discrimination and Employment Act ("ADEA"); in retaliation for taking or requesting leave under the Family and Medical Leave Act ("FMLA"), in violation thereof; and in retaliation for making a workplace safety complaint to the Occupational Safety and Health Administration ("OSHA"), in violation of Illinois common law and the Illinois Whistleblower Act ("IWA").

According to IGG, Ramon was terminated due to workplace misconduct, including his refusal to provide his supervisor with information about his ability to work his scheduled hours in light of his other full-time job. Now before the Court is IGG's motion for summary judgment. For the following reasons, the motion is granted.

# I.    Background

## A.    Facts[1]

IGG is a medical practice comprised of certified gastroenterologists and allied professionals, with its principal office in Gurnee, Illinois and a laboratory ("the Lab") in Libertyville, Illinois.  Def.'s L.R. 56.1 Statement of Facts ("DSOF") ¶ 1, ECF No. 53.  Ramon began working as a histology technician in the Lab on August 25, 2015, at the age of forty-eight years old.[2]  *Id.* ¶¶ 2, 6, 11.  He was hired by Lab Manager Rose Lauing, then fifty-seven years old, in consultation with Medical Director Tom Mientus, M.D., then fifty-one years old.  *Id.* ¶¶ 6, 11.

Lauing and Mientus had each known Ramon for many years and had some reservations about hiring him due to various rumors they had heard about him, including that he had previously used drugs, slept in his car, fought with a coworker, and been fired from a job.  *See id.* ¶ 6; Pl.'s L.R. 56.1 Statement of Additional Facts ("PSOAF") ¶ 4, ECF No. 66.  But they needed a histology technician to work the night shift, and Ramon had over twenty years of experience.  DSOF ¶ 6.

Ramon was scheduled to work in the Lab from 6:00 p.m. to 12:00 a.m., Monday through Friday.  *Id.* ¶ 5.  While working at IGG, Ramon also held a full-time job

---

[1]    The following facts are undisputed or deemed admitted, unless otherwise noted.

[2]    A histology technician prepares human tissue specimens for a pathologist, who then uses the specimens to diagnose cancer or other abnormalities.  DSOF ¶ 16.  To prepare a specimen, a technician slices the block of paraffin wax in which the tissue comes encased into a ribbon containing six or seven sections of tissue before placing the ribbon in a water bath.  *Id.*  As the tissue floats, the technician identifies the best section of tissue and places it on a slide, after which the technician transfers the slide to a rack for staining.  *Id.*

during the day with a different medical practice, called University Dermatology & Vein Clinic ("University Dermatology"). *Id.* ¶ 10.

When Ramon began working at IGG, the Lab was operating nearly around the clock in order to process tissue specimens within a twenty-four-hour turn-around time for IGG's seventeen different clinics. *Id.* ¶¶ 5, 51. IGG also had contractual obligations to process specimens for two outside labs. One of these outside labs was "M Lab," a company owned by Mientus. *Id.* ¶ 14.

At IGG, Ramon reported to Lauing, but because he worked at night and she worked during the day, they did not see each other often and mostly communicated by email or text message. *Id.* ¶ 9. Their rapport was generally friendly during Ramon's first two years with IGG, and he received positive annual performance reviews from Lauing in those years. *Id.* ¶ 19; *see also* PSOAF ¶¶ 11–12. In the Lab, Ramon worked alongside his older son, Jacob. DSOF ¶ 19. A third histology technician, who was hired in December 2016, worked an afternoon shift. *See id.* ¶¶ 16, 54.

Jacob switched to an early morning shift in July 2017, due to a sleep disorder, leaving Ramon to work most of the night shift alone. *Id.* ¶ 20. Shortly thereafter, Ramon began to complain about doing work for M Lab, expressing to Lauing that he had a "phobia" of doing what he called "free work" for Mientus's lab (although neither IGG nor Ramon went uncompensated for that work). *Id.* ¶ 21. Ramon also began to complain about his hours, stating that he needed some sunlight hours to himself between his two jobs and obtained permission from Lauing to come into the Lab later

3

in the evening. *See* Pl.'s Resp. Def.'s L.R. 56.1 Statement of Facts ("Resp. DSOF") ¶ 20, ECF No. 65.

Lauing and Mientus met with Ramon in early November to assure him that there was nothing free or otherwise improper about the work that IGG did for M Lab. DSOF ¶ 22. But Ramon remained unconvinced and thereafter refused to process any more M Lab specimens. *Id.*; PSOAF ¶ 50. Lauing acquiesced by trying to have that work done by someone else when Ramon was not in the Lab. DSOF ¶ 22.

In January 2018, Ramon committed two significant errors at work. During his shift on January 3,[3] Ramon placed the tissue of one patient on a slide belonging to a different patient. *Id.* Had Mientus not caught the error, the patient could have received an incorrect diagnosis, potentially resulting in unnecessary surgery. *Id.* Mientus and Lauing agreed that this error was serious enough to warrant corrective action. *Id.* ¶ 27. So, after Lauing investigated the incident and spoke to Ramon over the phone on January 8, she prepared a notice of corrective action on January 9. *Id.*; *see* Def.'s Exs., Tab 7, Ramon Dep. Ex. 12, 1/9/18 Corrective Action Form, ECF No. 53-2.

The second lab error occurred on January 18, 2018. This time, after clocking in at 1:08 a.m., Ramon switched a patient's tissue samples by placing one type of tissue on a slide intended for another type of tissue. DSOF ¶¶ 28–29. Mientus and

---

[3]     That night, Ramon did not clock in until 1:38 a.m. DSOF ¶ 26. Although Ramon's clock-in times were never all that consistent during his first two-plus years with IGG, they became later than usual in January 2018. During that month, Ramon clocked in after 11:00 p.m.—the time that, in his own view, was the latest he was allowed to clock in—at least eight times. *See* DSOF ¶¶ 24–25.

Lauing thought this error warranted corrective action as well. And after Lauing spoke to Ramon about it in the Lab, she prepared another notice of corrective action that same day. *Id.* ¶¶ 29–30.

On January 20, 2018, Ramon called Lauing to request FMLA leave for a surgical operation on January 25. *Id.* ¶ 31. IGG's Human Resources Director John Haukland followed up with the necessary paperwork, and Ramon ultimately requested FMLA leave from January 22 to February 19, though he later asked to return on February 12. *Id.* ¶ 33. According to Ramon, during his call with Lauing, she asked him if he wondered whether he was getting too old to work two jobs and if he was going to quit. Roman also states that Lauing had made a similar comment about his age a couple of weeks earlier. *Id.*; *see also* PSOAF ¶¶ 14–15. Lauing does not recall making such comments on either occasion, but she does recall once telling Ramon that *she*, who was nine years' his senior, was getting too old to work two jobs. DSOF ¶ 32.

On Friday, February 9, while Ramon was on his FLMA leave, Lauing called Ramon to notify him that he would be receiving notice of corrective action when he returned to work on the following Monday.[4] *Id.* ¶ 34. Lauing and Haukland then met with Ramon to discuss the corrective action forms on Wednesday, February 14, and also instructed him to come to work by 8:00 p.m. *Id.* ¶ 38. Ramon, however, protested that corrective action was unnecessary because Mientus had caught the

---

[4]     The parties dispute whether Lauing had discussed the first notice of corrective action with Ramon before he went on FMLA leave on January 22, 2018. *Compare* Def.'s Exs., Tab 5, Lauing Dep. at 100:18–100:21, ECF No. 53-2, *to* Resp. DSOF ¶ 28.

errors. *Id.* After diverting the conversation to other topics, including an error he believed had been made in the Lab the previous October, Ramon said that he needed more time to review the corrective action forms before signing them. *Id.* ¶¶ 38–39. Lauing agreed to leave the forms on a table in her office so that Ramon could review them at his convenience after she left, but Ramon instead took them out of her office and never returned them. *Id.* ¶ 39.

From February 16 to 21, Ramon took intermittent FMLA leave to care for his father, who had recently been diagnosed with cancer. *Id.* ¶¶ 37, 41. A few days after Ramon returned, Lauing reminded him to return the corrective action forms, but Ramon said that he needed more time to review them. *Id.* ¶¶ 41–42. Haukland asked Ramon to return the forms by March 5. *Id.* ¶ 42.

Around the same time, Ramon began to complain about perceived workplace safety issues, especially with regard to the ceiling in the Lab, which had sprung a leak. *Id.* ¶ 43; PSOAF ¶ 18. On March 3, Ramon sent an email to Haukland and Lauing sharing his concern that, while the ceiling tiles appeared to have been replaced, the leak had not actually been repaired, and that black mold was growing in the ceiling—a concern he had first brought up on February 14. DSOF ¶ 43; PSOAF ¶¶ 18, 20. Lauing assured Ramon that the leak had been repaired on January 23, while he was out on leave, but Ramon insisted on hearing from Haukland. DSOF ¶ 43. Haukland responded that Ramon was "spending a great deal of time involving [him]self in things that [were] not [his] responsibility." *Id.* ¶ 44.

Ramon resumed intermittent FMLA leave from March 5 to 12. *Id.* ¶ 45. On March 17, he emailed Haukland to say that he was again taking FMLA leave to care for his father. *Id.* ¶ 47. In his email, Ramon also reiterated his concerns about black mold growing in the Lab's ceiling and brought up a xylene spill that had occurred six months ago, which he called "OSHA issues." *Id.* ¶ 48; PSOAF ¶ 21. And he chastised Haukland for acting "unprofessional" by asking him how his father was doing when they had seen each other in the Lab earlier that week. *Id.*; *see id.* ¶ 46.

Ramon's father died on March 19. *Id.* ¶ 49. Ramon took bereavement leave through March 23, *id.*, and was not scheduled to work on March 24, PSOAF ¶ 22. IGG contends that Ramon was scheduled to work the following Monday, March 26, while Ramon says he was not scheduled to work until Tuesday, March 27. *Compare* PSOAF ¶ 22, *to* Def.'s Resp. Pl.'s L.R. 56.1 Statement of Additional Facts ("Resp. PSOAF") ¶ 22, ECF No. 77. Either way, when Ramon did not arrive for work on March 26, Lauing emailed Haukland to ask whether that, combined with his other recent behavior, including his refusal to do at work related to M Lab, warranted termination of his employment. Resp. PSOAF ¶ 23.

On March 28, 2018, Lauing issue a memo to all Lab employees, announcing a major change to the Lab's hours: effective that week, specimens would be processed during daytime hours only, with the Lab to close daily at 5:00 p.m. *Id.* ¶ 53. Lauing and Mientus had first considered this change over a year earlier because the Lab had difficulty recruiting and retaining staff to process tissue specimens outside of daytime business hours. *Id.* ¶ 50. But they first had to obtain the approval of IGG's Board of

Managers ("the Board"), which they obtained in late March 2018. *Id.* ¶¶ 50-52. As a result of the change, Ramon's start time moved from 8:00 p.m. to 10:00 a.m., while the other histology technicians had their start times move from 2:00 p.m. to 7:30 a.m. and from 4:00 a.m. to 9:00 a.m., respectively. *Id.* ¶ 54.

The next day, Ramon sent an email to Lauing, Haukland, Mientus, IGG's President, IGG's Chief Operating Officer, and all of his co-workers. *Id.* ¶ 55. The email jumped from topic to topic, questioning Lauing's integrity here and offering to have Ramon's nephew investigate the Lab's ventilation system there. *Id.* Ramon also said that he had mailed a workplace safety complaint to OSHA about the Lab on March 28. *Id.* He concluded that he would get back to Lauing about his new start time, asserting that he had to take care of his autistic and diabetic 13-year-old son most mornings. *Id.* Lauing was not previously aware that Ramon cared for his younger son on weekdays. *Id.* ¶ 56.

Based on Ramon's statements about this son, Haukland sent Ramon FMLA forms for his son's physician to complete and asked Ramon to contact him about the new start time so that the Lab could make any necessary adjustments. *Id.* ¶ 57. Ramon sent an email to Lauing about his new schedule the next day, complaining that his job was on the line. *Id.* ¶ 58. But when Lauing asked him when he planned to come to work, Ramon said only that he would not be in on April 2 because his new hours conflicted with the time that he cared for his younger son, without providing further information. *Id.* ¶ 59.

On April 3, Lauing again reached out to Ramon about his ability to work his new schedule. *Id.* ¶ 60. She assured him that he would be provided with all of the FMLA leave to which he was entitled to care for his son, but wondered whether he could work the new hours at all, given that he still had a full-time day job with University Dermatology. *Id.* She also suggested that IGG could work around his schedule if there were certain hours each day that he cared for his son. *Id.*

In a response Ramon reiterated that his new schedule interfered with the hours during which he cared for his younger son, making liberal use of bold text, exclamation points, and all caps. *See id.* ¶ 61. Lauing responded:

> We will tentatively designate this entire week as job-protected leave under the FMLA, subject to providing the appropriate documentation in the designated timeframe. However, we need to know your plans for the longer term. Will your other job interfere with your newly scheduled hours? Although we understand that this may change, during what hours do you *typically* care for your son when he is not on break? If your schedule is unpredictable, please let us know generally when you cared for you son during the month of March (e.g., mornings? After school?). We need to ensure that we are staffed to effectively serve patient needs and we require cooperation from you in this regard. Please contact me by no later than Friday noon regarding your anticipated schedule for next week. If you are unwilling to provide this information, we will consider terminating your employment. Thank you.

*Id.* ¶ 62. In reply, Ramon said only: "**I'm not going to say much about My return date.**"[5] *Id.* ¶ 63.

---

[5]     Ramon now concedes that he did not consistently care for his younger son on weekdays during the time in question, but asserts that he had to do so during the first week of April 2018, because his son was then on spring break. *See* Resp. DSOF ¶ 67. Ramon also concedes that he nonetheless continued to attend his other full-time job during that week. *Id.*

9

Three days later, on April 6, 2018, Lauing, Mientus, and Haukland decided to terminate Ramon's employment with IGG. *Id.* ¶ 64. Haukland sent the termination email to Ramon the same day, citing primarily his refusal to cooperate with Lauing's requests for information about his ability to work his new scheduled hours in light of his other full-time day job, as well as the following secondary reasons: his two recent lab errors; his refusal to return the corrective action forms for those errors; his recent unexcused deviations from his work schedule; his ongoing refusal to perform work for M Lab; and his recent inappropriate emails. *Id.*; *see* Defs.' Exs., Tab 7, Ramon Dep. Ex. 27, 4/6/18 Email from J. Haukland to R. Ramon ("Termination Email"), ECF No. 53-2. IGG ultimately hired Su Britton, who was forty-nine years old, to fill the position left vacant by Ramon's termination. DSOF ¶ 69.

Three days later, on April 9, 2018, OSHA performed an unannounced inspection of the Lab, ostensibly as a result of Ramon's complaint. DSOF ¶ 74. The inspection did not turn up any safety issues or lead to any citations. *Id.*

## B. Procedural History

Ramon filed this case in March 2019. His complaint raised six counts in connection with his termination by IGG: (1) race discrimination under Title VII, (2) national-origin discrimination under Title VII, (3) gender discrimination under Title VII, (4) age discrimination under the ADEA, (5) retaliation under the FMLA, and (6) retaliatory discharge under Illinois common law. 1st Am. Compl. ¶¶ 18–58, ECF No. 34. He has since voluntarily dismissed the Title VII claims. *See* 2/19/20 Min. Entry, ECF No. 47 (granting Ramon's oral motion to dismiss). He has also added a claim of

retaliation under the IWA, which IGG agreed to recognize without making him file a second amended complaint. *See* Def.'s Mem. Supp. Mot. Summ. J. at 13 n.5, ECF No. 52. IGG now moves for summary judgment on Ramon's remaining claims. *See* Def.'s Mot. Summ. J., ECF No. 51.

## II.  <u>Legal Standard</u>

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014). In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then "come forth with specific facts showing that there is a genuine issue for trial." *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019). To satisfy that ultimate burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could

return a verdict in her favor," *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

### III.   Analysis

IGG moves for summary judgment on each of Ramon's remaining claims. The Court discusses each in turn.

### A.   Age Discrimination (Count IV)

Ramon's first claim arises under the ADEA, 29 U.S.C. § 621 *et seq.* In relevant part, that statute "makes it unlawful for an employer 'to fail or refuse to hire or to discharge any individuals or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018) (quoting 29 U.S.C. § 623(a)(1) (cleaned up)).

To succeed on a claim of disparate treatment under the ADEA, a plaintiff must prove, "by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009); *see also Martino v. MCI Commc'ns Serv., Inc.*, 574 F.3d 447, 455 (7th Cir. 2009) ("[I]n the ADEA context, it's not enough to show that age was *a* motivating factor."). "An ADEA plaintiff may satisfy this burden through two methods." *Skiba*, 884 F.3d at 719. "First, she may proceed by introducing direct or circumstantial evidence that her employer took an adverse action against her because of her age."

*Id.* (cleaned up). "Alternatively, she may use the *McDonnell Douglas* burden shifting framework." *Id.* (cleaned up); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). Under that framework, a plaintiff "must show evidence that (1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Skiba*, 884 F.3d at 719 (cleaned up).

"If the plaintiff meets each element of her prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* at 719–20 (cleaned up). "However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse action *because of* her age." *Carson v. Lake Cty.*, 865 F.3d 526, 533 (7th Cir. 2017); *see also Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (reiterating that the standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [protected status] caused the discharge or other adverse employment action").

### 1. Ramon's Prima Facie Case of Age Discrimination

Here, Ramon points to his disputed testimony that Lauing had asked him "if he was getting too old to work two jobs" during their January 20, 2018, phone call, and that she "had made a similar comment about his age a couple of weeks before

that as well." PSOAF ¶¶ 14–15. From this, Ramon argues that a reasonable inference is that he was terminated because of his age. But, even assuming that a reasonable jury would find that Lauing made these disputed statements (as the Court must at this juncture), it could not infer from them that age was the but-for cause of IGG's decision to terminate Ramon's employment.

For starters, Lauing's statements "are innocuous when viewed in context." *See Skiba*, 884 F.3d at 720 (citing *Baker v. Silver Oak Senior Living Mgmt. Co.*, 581 F.3d 684, 688 (8th Cir. 2009) (recognizing that statements made in an ADEA case "must be viewed . . . in context")). Even on their face, they do not suggest that Lauing considered Ramon "too old to perform his job," as he asserts, Pl.'s Resp. Opp'n Def.'s Mot. Summ. J. ("Resp.") at 17, ECF No. 67, but merely too old to maintain *two* jobs. Indeed, between his two jobs, Ramon worked seventy hours per week throughout his employment with IGG—an exceptional amount at any age. And during the first three weeks of January 2018, he had been clocking into the Lab especially late and made two serious lab errors. Moreover, in requesting FMLA leave on January 20, Ramon cited his need for "rest" and to be "in a good state of mind." PSOAF ¶ 13. Viewed under these circumstances, Lauing's statements suggest only that she was concerned Ramon was working too many hours, not that he was too old for his job.

The broader context of Ramon's employment with IGG likewise demonstrates that his age was not a factor in his termination. Recall that Ramon was hired at the age of forty-eight by the same decisionmakers (minus Haukland) who fired him less than three years later. And, as the Seventh Circuit has observed, "it seems rather

suspect to claim" that these decisionmakers "suddenly developed an aversion to older people" within a few years. *See Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1147 (7th Cir. 1994) (cleaned up) (discussing a forty-seven-year-old plaintiff who was fired two years into the job); *see also Proud v. Stone*, 945 F.3d 796, 797 (4th Cir. 1991) ("[I]n cases where the hirer and firer are the same individuals and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by an employer."). An inference of age discrimination is all the more suspect given that these decisionmakers—two of whom never commented on Ramon's age—were each several years older than him. *See Rooks v. Girl Scouts of Chi.*, 95 F.3d 1154, 1996 WL 459941, at *4 (Table) (7th Cir. 1996) (citing *Marlow v. Office of Court Admin. of N.Y.*, 820 F. Supp. 753, 757 (S.D.N.Y. 1993) (recognizing that "claims of discrimination become less plausible" where the decisionmaker "is in the same protected class" as the plaintiff), *aff'd*, 22 F.3d 1091, 1994 WL 126596 (Table) (2d Cir. 1994)). That Ramon's replacement was only two years younger than him further diminishes any inference of ageism. *See Rand*, 42 F.3d at 1147 (discussing a "fairly marginal difference" of nine years between the plaintiff and his replacement).

Accordingly, the Court finds that Ramon has not established a prima facie case of age discrimination.

### 2.    IGG's Legitimate, Nondiscriminatory Reasons

Even assuming that Ramon could establish a prima facie case of age discrimination,[6] IGG has articulated numerous "legitimate, nondiscriminatory reason[s]" for terminating his employment. *See Skiba*, 884 F.3d at 719 (cleaned up). Primarily, Haukland's termination email pointed to Ramon's refusal to comply with Lauing's request for information about his ability to work his new schedule. She was particularly concerned about this given that Ramon had another full-time day with University Dermatology. *See* Termination Email. And yet, Ramon refused to provide that information along these lines, despite multiple opportunities to do so and despite Lauing's explicit warning that failure to do so would be grounds for termination.

In the email, Haukland also cited a variety of other reasons that contributed to IGG's decision to terminate Ramon's employment, namely: his two recent lab errors, which IGG considered serious; his refusal to return the corrective action forms; his refusal to do work for M Lab, which was part of his assigned duties; his deviations from his work schedule, which IGG viewed as unexcused; and the tenor of some of his recent emails, which IGG found inappropriate. *See id.*

These stated reasons are sufficient to shift the burden back to Ramon, and he must submit evidence that they are but a pretext for discrimination. In other words, Ramon must offer facts to show that IGG's reasons for terminating him are "not credible or . . . factually baseless." *Fischer v. Avande, Inc.*, 519 F.3d 393, 403 (7th Cir.

---

[6]    Ramon does not argue that he can satisfy his prima facie case, with regard to any claim, under the *McDonnell Douglas* framework, and so has waived any such argument. *See Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999).

2008) (cleaned up); *see also Olsen v. Marshall & Ilsley Corp.*, 267 F.3d 597, 601 (7th Cir. 2001) ("The type of evidence pertinent at the pretext stage, *i.e.*, evidence that calls into question the veracity of the employer's explanation, may take on many forms, including that which shows that the employer's explanation is without basis in fact." (cleaned up)). The issue of pretext "does not address the correctness or desirability of [the] reasons offered" for the adverse decision, but rather only "whether the employer honestly believes in the reasons it offers." *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992). And where, as here, the employer "has offered multiple nondiscriminatory reasons for its . . . decision, showing that one of these reasons is pretextual is not enough." *Fischer*, 519 F.3d at 403.

Ramon does not point to any facts from which a reasonable jury could find that each of IGG's stated reasons is pretextual. To begin, Ramon contends that, because he was on tentative FMLA leave when Lauing asked him about his new schedule, he did not have enough time to provide the information. But the record makes clear that Ramon was both able and willing to send Lauing several emails on the subject between the time that he received his new schedule and his termination. And yet, instead of complying with Lauing's request or providing any reason why he could not do so at the time, Ramon's emails blatantly refused to say whether his other full-time job affected his ability to work his new scheduled hours. *Cf. Kahn v. U.S. Sec'y of Labor*, 64 F.3d 271, 279 (7th Cir. 1995), *as modified* (Sept. 7, 1995) ("We have consistently held that an employee's insubordination toward supervisors or coworkers, even when engaged in a protected activity, is justification for

termination."). What is more, Ramon cites no evidence to support his theory that Lauing and Mientus changed the Lab's hours to target him, rather than to obviate the difficulty of operating the Lab outside of daytime hours. And, while Ramon points out that Lauing raised the idea of firing him as early as March 26, 2018, after he took what she viewed as an unexcused absence, she did so only in conjunction with his other actions that gave her concern. Ramon's consistent refusal to address his ability to work his new schedule served only as the final straw that led to his termination.

Along those lines, no reasonable jury could find from this record that the other reasons offered by Defendants for Ramon's termination were guises for discrimination. For instance, Ramon challenges IGG's reliance on his lab errors by asserting that the younger technicians were not disciplined for failing to catch errors or for committing a different error the previous fall. But he fails to show that his superiors' explanation for why his errors were more serious than those of his coworkers, especially in light of his greater experience, is either dishonest or devoid of factual basis. Ramon also asserts that he was unable to return the corrective action forms for his lab errors because he was on tentative FMLA leave when he was terminated, yet ignores his refusal to return the forms for weeks on end leading up to that point.[7]

Furthermore, Ramon fails to offer any facts to counter IGG's view that his absence of March 26 and his string of especially late clock-in times during the

---

[7]    As to Ramon's suggestion that he did, in fact, return the corrective action forms, he cites no evidence to controvert IGG's contrary statement of fact, which he admitted in his responsive statement of facts. *See* Resp. DSOF ¶ 39.

previous January were unexcused. And, as to his acerbic emails, Ramon fails to explain how they could not be seen as inappropriate. Finally, while Ramon points out that he had been refusing to do M Lab work since October 2017, that alone does not undermine the cumulative impact of this infraction. *Cf. Lee v. Mostyn Law Firm*, No. CIV.A. H-04-3473, 2006 WL 571859, at *5 (S.D. Tex. Mar. 6, 2006) ("[T]hat Defendant may have had several cumulative reasons for terminating Plaintiff . . . does not satisfy Plaintiff's burden of offering some evidence that permits an inference that Defendant's proffered reasons . . . were a pretext for discrimination." (emphasis removed)).

Finally, putting aside the burden-shifting approach under *McDonnell Douglas*, the Court concludes for the reasons explained that, when the record is taken as a whole, no reasonable jury could find that Ramon's age was the but-for-cause of his termination. *See Ortiz*, 834 F.3d at 765. As such, IGG's motion for summary judgment is granted as to Count IV.

## B.    FMLA Retaliation (Count V)

Ramon also asserts a claim for retaliation under the FMLA, which prohibits an employer from retaliating against an employee's exercise of rights provided under the statute. *See* 29 U.S.C. § 2615(a)(1). This claim is governed by the same burden-shifting framework as Ramon's ADEA claim. *See King v. Preferred Tech. Grp.*, 166 F.3d 887, 891–92 (7th Cir. 1999). Thus, "in order to make out a prima facie retaliation case under the FMLA," the plaintiff must show "that the evidence would permit a reasonable factfinder to conclude that [her] FMLA status caused the adverse

employment action at issue." *Kemp v. Cty. of Cook*, No. 15 C 4176, 2016 WL 6524945, at *3 (N.D. Ill. Nov. 3, 2016). If the plaintiff "meets each element of her prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *See Skiba*, 884 F.3d at 719–20 (cleaned up).

### 1.    Ramon's Prima Facie Case of FMLA Retaliation

As evidence that his FMLA status was the but-for cause of his termination, Ramon relies principally on the proximity in time between his string of FMLA requests in the first quarter of 2018 and the troubles that led to his termination. The Seventh Circuit, however, has "often observed" that "suspicious timing alone is almost always insufficient to survive summary judgment." *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011). Furthermore, "suspicious timing must be evaluated in the context of the whole record." *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 496 (7th Cir. 2014). Doing so here demonstrates that this is not the "rare case" in which suspicious timing "is sufficient to create a triable issue." *See id.* (cleaned up).

As an initial matter, the chronology at issue is not as suspicious as Ramon contends. In Ramon's view, he first requested FMLA leave on January 12, 2018, when he texted Lauing a "heads up" that he would need three days off for a surgical procedure, PSOAF ¶ 13, and before she had prepared corrective action forms for either of his lab errors. But Ramon did not mention the FMLA at that time, and his

20

request for leave did not implicate the statute until he asked for "more than three consecutive . . . days" off. *See* 29 C.F.R. § 825.102 (defining qualifying medical leave). And it is undisputed that Lauing prepared a notice of corrective action for Ramon's second lab error on January 18—two days before Ramon's text. DSOF ¶ 30. Moreover, while Ramon speculates that Lauing did not prepare the notice of corrective action for his first lab error until after he took FMLA leave, such "metaphysical doubt" does not controvert the evidence showing that she prepared it on January 9, as indicated on the face of the form. *See Matsushita*, 475 U.S. at 586; *see also* 1/9/18 Corrective Action Form. As a result, Ramon cannot establish an inference that his first stint of FMLA leave caused Lauing to prepare either corrective action document.

Furthermore, while Ramon was on tentative FMLA leave at the time he was terminated, his refusal to comply with Lauing's request for information about his ability to work his new schedule—the primary reason why IGG fired him—was a significant intervening event that separated his final exercise of FMLA rights and his termination. And "where a significant intervening event separates an employee's protective activity from the adverse employment action he receives, a suspicious timing argument will not prevail." *Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (cleaned up). That Ramon was still on tentative leave during that intervening event does not change this outcome. *See Kahn*, 64 F.3d at 279. Finally, while many of the secondary reasons cited in Haukland's termination email (beyond the lab errors) occurred sometime between Ramon's first and last taking of FMLA leave, this

does not prohibit IGG from taking those factors into account when deciding to terminate him. *Cf. Kidwell*, 679 F.3d at 957 (reiterating that an employee's protected activity "does not immunize him from being subsequently disciplined or terminated for inappropriate workplace behavior" (cleaned up)).

Ramon's other arguments to support his claim are equally unpersuasive. He first suggests that Lauing's call to him on February 9, 2018, while he was still on FLMA leave, to inform him that he would be receiving corrective action the following week demonstrates her unhappiness about his leave. But Lauing's explanation that she did so only to avoid "blindsid[ing]" him with the bad news upon his return dispels any such inference. *See* Lauing Dep. at 100:18–100:21. Ramon also posits that Lauing's frustration that he did not report to the Lab on March 26, following his bereavement leave, demonstrates her resentment toward his need for leave. To the contrary, the record shows that Lauing was upset only because she viewed Ramon's absence on that day as unexcused.

## 2.  IGG's Legitimate, Nondiscriminatory Reasons

Again, even assuming for the sake of argument that Ramon could meet his prima facie burden to show that his FMLA status caused his termination, IGG has articulated an array of legitimate, nondiscriminatory reasons for that decision for the reasons discussed above. And other than chronology, Ramon provides no factual grounds to believe the reasons were pretext for FMLA retaliation. Accordingly, whether the record is considered under the burden-shifting method or viewed in its

entirety, the Court concludes that no reasonable jury could find that Ramon's termination violated the FMLA.

## C.   Illinois Retaliatory Discharge (Count VI)

Next up is Ramon's claim of retaliatory discharge under Illinois common law, which is premised on the OSHA complaint he made in late March 2018. "To sustain a cause of action for retaliatory discharge, an employee must prove that (1) the employer discharged the employee, (2) the discharge was in retaliation for the employee's activities (causation), and (3) the discharge violates a clear mandate of public policy." *Michael v. Precision All. Grp., LLC*, 21 N.E.3d 1183, 1188 (Ill. 2014). "The requirement that the discharge be in retaliation for plaintiff's activities requires that a plaintiff establish a causal relationship between the employee's activities and the discharge." *Id.*

"In resolving retaliatory discharge claims, Illinois does not apply the *McDonnell Douglas* burden-shifting framework commonly applied in federal retaliation cases." *Gordon*, 674 F.3d at 774. "Instead, to establish a causal relationship, [the plaintiff] must affirmatively show that the discharge was primarily in retaliation for her exercise of a protected right.'" *Id.* (cleaned up). "To do so, [the plaintiff] must proffer sufficient evidence from which a reasonable jury could infer that the employer was improperly motivated." *Id.* (cleaned up). "Only after [the plaintiff] has met this burden is [the defendant] required to provide a legitimate reason for its decision to terminate her." *Id.*

23

### 1.    Ramon's Evidence of Motivation Improper

As evidence that IGG was "intoleran[t] of [his] complaints about workplace safety issues," Resp. at 18, Ramon relies on the "suspicious timing" between his OSHA complaints and his termination, *see Leitgen*, 630 F.3d at 675. In particular, Ramon emphasizes that, in two of the emails that Haukland referenced in the termination letter (dated March 17 and March 29, 2018, respectively), Ramon noted the safety issues as "OSHA issues" and said he had made an OSHA complaint.

But again mere suspicious timing "is almost always insufficient" to create a triable inference of improper motivation. *See Leitgen*, 630 F.3d at 675. And when the timing here is "evaluated in the context of the whole record," *Taylor-Novotny*, 772 F.3d at 496, no reasonable trier of fact could find that Ramon's exercise of his right to file an OSHA complaint, in and of itself, had any impact on IGG's decision to terminate him. For starters, it is undisputed that Ramon's safety concerns were all non-issues by the time he began to raise them, just as Lauing had assured him all along. And indeed, OSHA found no safety issues upon its unannounced inspection of the Lab. What is more, as a facility certified by the College of American Pathologists, the Lab was already required to be open for unannounced inspections at all times to check its compliance with quality-control standards that exceed those set by federal regulations. DSOF ¶ 12. Thus, given that IGG had no reason to fear the prospect of OSHA scrutiny, Ramon's reliance on timing alone is insufficient to fend off summary judgment.

Ramon's citation to Haukland's response emails does not support a contrary result. Instead, the emails reveal only that Haukland was growing increasingly frustrated with Ramon's preoccupation with issues for which Lauing, as Lab Manager, was responsible, and which she had assured him were non-issues. Ramon's refusal to drop these non-issues, despite instructions to the contrary, was further "justification for [his] termination." *See Kahn*, 64 F.3d at 279. In sum, Ramon fails to create an inference that IGG was improperly motivated by his OSHA activity when it terminated him.

### 2. IGG's Legitimate Reasons

In any event, as explained, IGG has provided numerous "legitimate reason[s]" for that decision. *See Gordon*, 674 F.3d at 774. Consequently, no reasonable jury could find that IGG committed retaliatory discharge under Illinois law.

### D. IWA Retaliation (Count VII)

That leaves Ramon's claim of retaliation under section 15(b) of the IWA, 740 Ill. Comp. Stat. Ann. 174/15(b), which is likewise premised on Ramon's OSHA complaint. "[T]o establish a cause of action under section 15(b), the employee must show (1) an adverse employment action by his or her employer, (2) which was in retaliation (3) for the employee's disclosure to a government or law enforcement agency (4) of a suspected violation of an Illinois or federal law, rule, or regulation." *Sweeney v. City of Decatur*, 79 N.E.3d 184, 188 (Ill. App. Ct. 2017).

In IGG's view, the causation required between the adverse employment action and the employee's disclosure under the IWA is the same as under Illinois retaliatory

25

discharge law and dooms Ramon's IWA claim. Although Illinois authority on this issue is sparse, *cf. Taylor v. Bd. of Educ. of City of Chi.*, 10 N.E.3d 383, 397 (Ill. App. Ct. 2014) (noting that "there is very little case law interpreting" the IWA), the Court is inclined to agree, *cf. Fragassi v. Neiburger*, 646 N.E.2d 315, 318 (Ill. App. Ct. 1995) (stating that a claim for retaliatory discharge requires a plaintiff to show "that he was terminated *for* protesting unsafe working conditions," which mirrors the IWA's causation language (emphasis added)). And in any event, Ramon failed to respond to this argument in his response brief and so waived any argument to the contrary. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

As such, for the reasons explained, the Court concludes that no reasonable jury could find from this record that Ramon's termination was caused by his complaint to OSHA.

## IV.    Conclusion

For the foregoing reasons, IGG's motion for summary judgment is granted. Judgment will be entered accordingly in favor of IGG. This case is closed.

**IT IS SO ORDERED.**                    **ENTERED   3/22/21**

_____
**John Z. Lee**
**United States District Judge**

26